IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| YONAS SEYOUM, | : | |
|     Plaintiff | : | No. 1:18-cv-00854 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| HM HEALTH SOLUTIONS, INC., | : | |
|     Defendant | : | |
| | : | |

## MEMORANDUM

This case arises out of the termination of Plaintiff Yonas Seyoum ("Plaintiff" or "Seyoum")'s employment with Defendant HM Health Solutions, Inc. ("Defendant" or "Solutions") in March of 2015, which Plaintiff alleges was due to race/national origin discrimination and/or retaliation for protected activity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. ("Title VII").  Before the Court is Defendant's motion for summary judgment.  (Doc. No. 35.)  For the reasons that follow, the Court will grant the motion.

## I.    BACKGROUND[1]

---

[1] The following relevant facts of record are taken from Defendant's Statement of Undisputed Material Facts ("SUMF") (Doc. No. 37), and Plaintiff's Answer to Statement of Facts ("ASMF") (Doc. No. 53), and are undisputed unless otherwise noted.  Both the SUMF and ASMF contain specific citations to the record at each numbered paragraph.  In connection with his ASMF, Plaintiff filed a "Statement of Additional Facts" set forth at paragraphs 64 through 85 of Plaintiff's ASMF.  Defendant filed a Response to Plaintiff's "Statement of Additional Facts" (Doc. No. 56), wherein it argues that the Court should disregard Plaintiff's "Statement of Additional Facts" because it fails to comport with Local Rule 56.1 of this Court, which does not authorize a non-moving party to file a statement of facts in connection with a motion for summary judgment.  (Doc. No. 56 at 1-2.)  The Court agrees with Defendant.  Local Rule 56.1 of this Court contemplates only that a party opposing a motion for summary judgment file a statement of facts "responding to the numbered paragraphs set forth" in the moving party's statement of facts.  See L.R. 56.1.  Therefore, the Court will disregard Plaintiff's Statement of Additional Facts in connection with its consideration of Defendant's motion, and consider only Plaintiff's numbered responses to Defendant's SUMF, in accordance with Local Rule 56.1   See Sash v. Hogsten, No. 07-0475, 2009 WL 249649, at *2 (M.D. Pa. Feb. 2, 2009) (providing that Local Rule 56.1 "does not provide for a non-moving party to file his own statement of material

Defendant is a company with more than 3,500 employees based in Pittsburgh, Pennsylvania, which partners with thirteen (13) health plans serving ten (10) million members. (Doc. No. 37 ¶ 1.)  Plaintiff is of African descent, having been born in Ethiopia and immigrating to the United States in 1983.  (Id. ¶ 2.)  Plaintiff is a former employee of Defendant and, before Defendant, its predecessor company, Highmark, Inc. ("Highmark").  (Id.)  While employed by Defendant and its predecessor company, Plaintiff worked in various roles in the Voice Services and Contact Center Solutions departments, all of which were oriented toward providing information technology support for Defendant and its predecessor Highmark.  (Id. ¶ 3.)  In his last few years of employment with Defendant, Plaintiff's responsibilities included administering the "NICE" call-recording application, a system that captured and archived incoming and outgoing customer-service phone calls.  (Id. ¶ 4.)

Shawn Klinger ("Klinger") was an information technology manager at Defendant who supervised Plaintiff for about three-and-a-half years from 2011 through Plaintiff's termination on March 13, 2015.  (Id. ¶ 5.)  Plaintiff did not remember Klinger ever making any comments regarding his race or national origin; moreover, Plaintiff confirmed that Klinger was not involved in any of the allegations regarding Plaintiff's previous complaint lodged with the Pennsylvania Human Relations Commission ("PHRC") against Highmark in 2007.  (Id. ¶¶ 8-9.)  Klinger testified that Plaintiff's race, national origin, and complaints of discrimination played no role in any employment decisions related to Plaintiff, including the decision to place Plaintiff on a Corrective Action Plan ("CAP") and recommend Plaintiff's discharge.  (Id. ¶ 10.)  Clayton Ash

---

facts but instructs the nonmoving party how to properly respond to the movant's statement of material facts"); Dreibelbis v. Young, No. 06-2055, 2007 WL 4344120, at *2 (M.D. Pa. Dec. 10, 2007) (stating that "based on the plain language of Local Rule 56.1, Plaintiff's filing of his own Motion and Statement of Material Facts is not technically sufficient to either oppose Defendants' Motion or deny Defendants' Statement of Material Facts").

("Ash") was the Director of Engineering Operations at Defendant – the Division within which Plaintiff worked – and supervised Klinger at the time of Plaintiff's termination in March 2015. (Id. ¶ 6.)  Plaintiff liked working with Ash and described him as supportive and as someone with whom he had a good working relationship.  (Id. ¶ 7.)  Plaintiff confirmed that Ash never said anything regarding Plaintiff's race or national origin that Plaintiff thought was inappropriate, and Ash testified that he did not take into account Plaintiff's race, national origin, or complaints of discrimination in reviewing and approving the decision to discharge Plaintiff.  (Id. ¶¶ 11-12.)

As noted above, in 2007, Plaintiff filed a complaint with the PHRC against Highmark, Defendant's predecessor company, asserting a count of national origin discrimination and alleging that Nancy Kellison ("Kellison"), who was a lead in Plaintiff's department, had acted in a discriminatory manner toward him.  (Id. ¶ 13.)  The basis of Plaintiff's allegations of national origin discrimination related to a "coaching session" wherein Kellison advised Plaintiff that she had received complaints from individuals to the effect that they had trouble understanding him due to his accent.  (Id. ¶ 14.)[2]  During the coaching session Kellison described to Plaintiff an example of a communication issue she had to work on herself – that she talked too fast and had to remind herself to slow down when trying to communicate a difficult concept.  (Doc. No. 37 ¶ 15.)  Plaintiff was not happy with Kellison's comments during the coaching session and sought specifics as to who was complaining to her about his communication.  (Id. ¶ 16.)  Ultimately,

---

[2] In response to this statement, Plaintiff cites his deposition testimony to the effect that he also linked his allegations of national origin discrimination against Kellison to the following:  an unfavorable review she prepared for Plaintiff; the way she treated him differently and less favorably than other team members not of Ethiopian national origin in meetings; and her monitoring of Plaintiff's phone calls and emails, which he maintains did not occur with non-Ethiopian employees.  (Doc. No. 53 ¶ 14.)

Plaintiff entered into a settlement agreement to resolve his 2007 PHRC complaint (the "Settlement Agreement'). (Id. ¶ 17.)

The Settlement Agreement provided that Plaintiff would be managed by Ash going forward and that Plaintiff would continue to work with Kellison, but did not specify particular duties or a department to which Plaintiff would be assigned. (Id. ¶ 18.)[3]  Plaintiff was offered the opportunity to switch into the "Network Services" department in connection with the Settlement Agreement; however, the position would have paid less and there was a higher chance the Plaintiff could potentially be affected by a workforce reduction. (Doc. No. 37 ¶ 19.)[4] Plaintiff did not accept the position in the "Network Services" department. (Doc. No. 37 ¶ 20.) Klinger testified that he did not know about Plaintiff's 2007 PHRC complaint until Plaintiff brought it to Klinger's attention in 2014, at which time Klinger suggested Plaintiff contact Clarice Cox in Defendant's Employee Relations Department to work through Plaintiff's concerns that another employee knew about his case. (Id. ¶ 21.) Klinger also testified that Kellison had no input as to:  the formulation of Plaintiff's goals for 2014, the decision to place Plaintiff on a Corrective Action Plan in 2015, or the decision to discharge Plaintiff. (Id. ¶ 22.) Plaintiff did not have to work with Kellison to accomplish the two issues that led to Plaintiff's placement on a Corrective Action Plan in 2015. (Id. ¶ 23.)  Plaintiff denies that his performance warranted his placement on a Corrective Action Plan. (Doc. No. 53 ¶ 23.)

---

[3] In response, Plaintiff cites to his deposition testimony for the proposition that he had a meeting with Ash prior to entering into the Settlement Agreement, and at that meeting, he was led to believe he would work for Ash in Network Services. (Doc. No. 53 ¶ 18.)

[4] In response, Plaintiff cites to his deposition testimony for the proposition that when he entered into the Settlement Agreement, Ash led him to believe that he would work in Network Services and receive a raise. (Doc. No. 53 ¶ 19.)

On October 5, 2012, Plaintiff, while on-call supporting tickets, sent an email to six (6) colleagues stating "[l]isted below are open tickets in the Service Center, please review and assign tickets to yourselves.  I will talking [sic] all the NICE tickets."  (Doc. No. 37 ¶ 24.)  On the same day, Kellison sent an email to Plaintiff stating as follows: "Hi Yonas, [p]lease resend this email and let everyone know that you will reach out for assistance for the next few times you are on call. (just as we discussed less than an hour ago) Since you did shadow Scott several times, I'm sure he had explained the process to you and can answer any additional questions. . . ."  (Id. ¶ 25.)  Kellison testified that the appropriate procedure was to "assign the tickets or speak with someone and let them know you're assigning the ticket to them . . . [n]ot to just say go out and grab the ticket, to assign it to yourself."  (Id.)  On October 11, 2012, Kellison sent a follow-up email to Plaintiff (this time copying Klinger) stating

> Hi Yonas, I've been hearing from your coworkers that you are not reaching out to them as I advise[d] you to do in the below email, but instead just assigning the ticket without reviewing it first.  I understand several of the tickets only needed to be reassigned to another area (Network Services).  There are many incident tickets that have a quick resolution, by discussing with your coworkers they will provide guidance so that in the future you will be able to handle the ticket on your own while on call . . . .

(Id. ¶ 26.)  On November 26, 2012, Plaintiff forwarded the October 5 and October 11 emails to Eric Goodling ("Goodling"), copying Klinger, and stating as follows:

> Hi Eric, I am following up on my reported harassment by Nancy Kellison as we discussed on October 22 . . . the tenor of the attached email from Nancy is derogatory, demeaning and false accusations.  Nancy is not my supervisor but she attempts to create a written personnel document to influence my manager . . .

(Id. ¶ 27.)  Klinger testified as follows regarding the email string that Plaintiff forwarded to Goodling:

> Okay.  So what I recall and what I see in this exchange of emails here between Nancy and Yonas, was really no indication of any type of harassment.  What I recall here was that there was a situation where Yonas was being asked to take on

5

on-call responsibilities as part of being in the department. Yonas was basically assigned a mentor by the name of Scott Moser. He worked with other peer[s] in the department to be cross-trained and to be given assistance on helping to work on incident tickets in the department. He was given specific instructions on how to manage and work these incidents tickets.

When Yonas started to support these tickets, he did not follow the instructions that he was provided by that peer, and what he did, and you can see in the actual email, instead of him taking accountability and actually trying to work the incident tickets, he only wanted to focus on the tickets that were specific to NICE, and he tried to push those tickets that were not related to NICE to other staff members. He simply tried to shotgun those out to the rest of the staff and said hey, I would like everybody to go out and you assign yourself to these tickets, which is what he is saying in this email dated October the 5th. It says: Listed below are the tickets. Please assign the tickets to yourself.

(Id. ¶ 28.) Klinger also testified that Kellison's email was well written, and that the purpose of the email was to instruct Plaintiff to ensure that he was following the operational process, and that there was no indication of any derogatory, demeaning, or false accusations. (Id.) Plaintiff testified that he felt the email from Kellison was derogatory because she copied Klinger and he felt that she was influencing his manager. (Id. ¶ 29.) Plaintiff denies this statement, because he states that the testimony cited indicates that he felt the email was derogatory because it characterized him as not doing his job, not following instructions, and not handling issues, in addition to the fact that it was sent to Plaintiff's manager. (Doc. No. 53 ¶ 29.)

Tina Beahm ("Beahm") was a colleague of Plaintiff who was also managed by Klinger. (Doc. No. 37 ¶ 30.) Beahm testified that she was trained on the NICE application and that she helped to support Plaintiff on the NICE application. (Id. ¶ 31.) Klinger wrote in Beahm's performance review that she "has done an outstanding job stepping up and learning Nice administration," demonstrating "initiative and solid work ethic in learning this new technology," and Beahm received an overall rating of "3 – Results Met All Goals & Expectations" on her 2014 performance appraisal. (Id. ¶ 32.)

6

Plaintiff's 2014 performance appraisal contained the following language, stating that Plaintiff "had over 8 months to initiate, learn and begin supporting configuration changes on the fax platform," but "pushed back indicating he did not have the time." (Id. ¶ 33.)  While Plaintiff admits that the referenced language appears in his 2014 performance appraisal, he denies the characterization that he "pushed back indicating he did not have time" to accomplish his assigned tasks, stating that he "advised Mr. Klinger a number of times that the goal needed to be delayed due to the delay in the upgrade of the NICE application and the fact that Plaintiff needed to train someone to take on some of the NICE responsibilities."  (Doc. No. 53 ¶ 33.)

Plaintiff was a subject matter expert on the NICE application.  (Doc. No. 37 ¶ 34.) Deborah Mackin ("Mackin"), the Senior Employee Relations Analyst at Defendant who reviewed the decision to discharge Plaintiff, testified that Plaintiff felt like he owned the NICE project and that there was a hesitation on Plaintiff's part to learn new things.  (Id. ¶ 35.)[5]  In 2011, in the first year he managed Plaintiff, Klinger wrote the following in Plaintiff's performance review: "[Plaintiff] should look for opportunities to expand his area of accountability by assuming tasks and assignments which go beyond the Nice environment.  He should look for opportunities to expand his skill set by proactively learning and engaging in new business processes."  (Doc. No. 37 ¶ 36.)[6]

---

[5] In response to this statement, Plaintiff cites his deposition testimony in support of his position that he advised Klinger a number of times that the goal needed to be delayed due to the delay in the upgrade of the NICE application and the fact that Plaintiff needed to train someone to take on some of the NICE responsibilities.  (Doc. No. 53 ¶ 35.)

[6] In response, Plaintiff cites his testimony that he told Klinger he wanted to expand into ACD vectoring, AT&T network routing, and the new virtual call system.  (Doc. No. 53 ¶ 36.)

Although Plaintiff was initially employed by Highmark, by 2014 Plaintiff was employed by Solutions, which was a new for-profit successor company of Highmark.  (Doc. No. 37 ¶ 37.) Ash testified as follows regarding the transition from Highmark to Solutions:

> I believe April 2013 we became a for profit IT shared service provider.  So we were on a cultural transformational journey to conduct our business, our core values, our operations.  We were truly a for profit company, not a below the line funny money allocation, cost allocation entity.  And so we were being asked to change our mindsets, our operations, our technologies, our strategic thinking, our tactical approach to things.  We were developing bench strengths, cross training. We were encouraging mobility of rotations through the organization to build your portfolio of knowledge and skills. . . . It started strongly in the 2014 timeframe . . . we started changing our processes and expectations within the rank and file.

(Id. ¶ 38.)   Mackin testified that, as a result of the transition to Solutions, expectations and corporate guidelines had changed, requiring employees to do more.  (Id. ¶ 39.)  With regard to evaluating employee performance, employee expectations at Solutions were established at the start of every year, and employees were measured against those expectations or tasks by the early part of the following year.  (Id. ¶ 40.)   Klinger established six (6) expectations for Plaintiff in 2014, including "Goal 4" for the year which required Plaintiff to "[l]earn, support and improve the Biscom fax configuration" and to "begin maintaining fax configuration changes by May 1, 2014."  (Id. ¶ 41.)  The "Biscom Fax" application facilitated the monitoring of facsimile communications.  (Id.)  Ash testified that requiring Plaintiff to learn Biscom Fax was consistent with Solutions' objective of having employees cross-train and develop "bench strength" across the whole division.  (Id. ¶ 42.)  Klinger testified that for Plaintiff to start on Goal 4 regarding Biscom Fax, he had to complete one hour of training (two thirty (30) minute sessions), at which

point he would have been in a position to begin working on assignments related to Biscom Fax. (Id. ¶ 43.)[7]

On February 24, 2014, Plaintiff requested a meeting with Klinger to express his concerns regarding having Biscom Fax on his list of goals for 2014, and Klinger consistently told Plaintiff that Biscom Fax would remain on Plaintiff's goal list.  (Doc. No. 37 ¶ 44.)[8]  Klinger testified that he told Plaintiff that employees were expected to cross-train and step up and do more.  (Doc. No. 37 ¶ 45.)  Following this meeting Plaintiff did not take steps over the next few months to satisfy his Biscom Fax goals, and at his mid-year review, maintained that he did not have time to complete the task.  (Id. ¶ 46.)  Plaintiff denies this statement, maintaining that he set up a meeting with Amy Smedley ("Smedley") and Eric Beck to get an overview of the application. (Doc. No. 53 ¶ 46.)  Klinger adjusted the target date for the goal from May 1, 2014 to October 1, 2014, and in his mid-year comments regarding Plaintiff, wrote that Plaintiff "develops a comfort zone for performing tasks in a routine manner, and can become resistant to changing that process."  (Doc. No. 37 ¶ 46.)   Klinger testified that, by October 1, 2014, Plaintiff still had not completed the required trainings or otherwise made sufficient progress on the task.  (Id. ¶ 47.) Defendant characterizes Plaintiff's testimony in this regard as stating that by October 1, 2014, he had not completed trainings for the Biscom Fax task, concluding that there was too much involved with Biscom Fax to take on the task, and that missing the task was insignificant.  (Id. ¶ 48.)  Plaintiff denies this statement, maintaining that in the cited testimony, he stated that he met

---

[7] In response, Plaintiff points to his testimony to support his statement that he advised Klinger that no documentation as to procedures regarding Biscom Fax existed, in contrast to the way Plaintiff had documented the NICE procedures.  (Doc. No. 53 ¶ 43.)

[8] In response, Plaintiff points to his testimony that Klinger also advised him that he would obtain assistance for Plaintiff with some of his responsibilities related to the NICE application.  (Doc. No. 53 ¶ 44.)

with one of the leads, Smedley, so he could get an overview of the application, and also that

nowhere in his testimony does he state that he felt that missing the task was "insignificant."

(Doc. No. 53 ¶ 48.)

      As of December 2014, based upon the rating of Plaintiff's goals and competencies in his

performance evaluation, Klinger made the decision (reviewed and approved by Ash) to give

Plaintiff a rating of "2 – needs improvement" on his overall 2014 performance appraisal.  (Doc.

No. 37 ¶ 49.)  Because assigning a performance rating of "2 – needs improvement" meant that

the employee would need to be placed on a "Corrective Action Plan," Klinger consulted with the

Employee Relations Department before giving Plaintiff his performance rating for 2014 to make

sure that he was following appropriate procedures.  (Doc. No. 37 ¶ 50.)  Plaintiff denies this

statement, asserting that an employee rating of "2 – needs improvement" does not require

placement on a Corrective Action Plan, citing Defendant's "Manager's Guide to the Corrective

Action Process," which states that a Corrective Action Plan is "recommended" when an

employee receives a "2" rating.  (Doc. No. 53 ¶¶ 50, 23.)

      Klinger testified that Plaintiff was placed on a CAP because he failed to complete the

task related to Biscom Fax and another task involving configuring an automation process for the

NICE application.  (Doc. No. 37 ¶ 51.)   Plaintiff requested to meet with Klinger and Ash in

December 2014 to discuss his work performance, and at that meeting, Plaintiff said that he did

not have enough time to complete his Biscom Fax training.  (Id. ¶ 52.)  Ash told Plaintiff that he

could not understand how Plaintiff was unable to set aside 5% to 10% of his time for Biscom

Fax.  (Id.)

      Plaintiff was placed on a CAP on February 6, 2015, and Klinger testified that one key

deliverable on the CAP was for Plaintiff to complete the tasks he missed in 2014.  (Id. ¶ 53.)

Klinger and Ash met with Plaintiff on the same day that Plaintiff was placed on a CAP.  (Id. ¶ 54.)  Klinger testified that he and Ash spent a good amount of time talking to Plaintiff about the reasons as to why Plaintiff was placed on a CAP and what would happen during the CAP process.  (Id.)  Plaintiff was reminded that it was his responsibility to take initiative and ensure that the tasks on his CAP would be met, and regular follow-up meetings were scheduled to review Plaintiff's progress.  (Id. ¶ 55.)  Goal 6 on Plaintiff's CAP was to improve his knowledge of Avaya One-X agent software support, as he was to work with the "CCS operations lead to deploy the latest software upgrade to Avaya One -X agent by April 30, 2015."  (Id. ¶ 56.)  Plaintiff was responsible for coordination of the software pack development, software distribution, and testing.  (Id.)  Goal 6 of the CAP was a time-sensitive task, requiring Plaintiff to work with Smedley, who was the operations lead.  (Id. ¶ 57.)  Klinger testified that because it generally took approximately eight (8) weeks to coordinate such an upgrade, it was important for Plaintiff to begin working with Smedley so he could complete the task on time.  (Id.)

On February 23, 2015, Plaintiff's attorney sent a letter to Mark Hopkins of Defendant's Employee Relations Department, which stated that "[s]o that we do not have to file another charge based on retaliation . . . age and race discrimination, we request that [Plaintiff] be transferred from Mr. Klinger's supervision."  (Id. ¶ 58.)[9]  With regard to Goal 6 of Plaintiff's CAP, on March 5, 2015, Plaintiff emailed Smedley indicating that he was to work with her in coordinating the Avaya One-X software pack development, and inquiring about her availability for a meeting.  (Id. ¶ 59.)  Smedley replied the same day via email, instructing Plaintiff to

_____

[9] In response to this statement, Plaintiff maintains that on March 10, 2015, Carl Shuman, Senior Counsel for Defendant, sent a response letter to Plaintiff's attorney indicating, among other things, that Plaintiff was "on the verge of termination," and that both Klinger and Mackin read this letter before Plaintiff was terminated.  (Doc. No. 53 ¶ 58.)

schedule a time on her calendar.  (Id.)  Smedley testified that her calendar was available to

Plaintiff such that he could have unilaterally entered the meeting time on her calendar without

approval from Smedley.  (Id.)  The next day, March 6, 2015, Plaintiff met with Klinger and Ash

to discuss his progress on his CAP.  (Id. ¶ 60.)  Klinger testified that his impression was that

Plaintiff had scheduled a meeting with Smedley and it appeared that Plaintiff was on track to

meet his goal.  (Id.)[10]  Six days later, on March 12, 2015, Klinger asked Smedley whether she

and Plaintiff had connected on the project.  (Doc. No. 37 ¶ 61.)   Klinger testified that Smedley

advised Klinger that Plaintiff had not in fact connected with her and scheduled a meeting,

forwarding him the email chain between herself and Plaintiff stating that "nothing from Yonas

except this on 3/5 (which I responded to)."  (Id.)[11]  Klinger testified that the time-sensitive nature

of the project, coupled with Plaintiff's failure to schedule a meeting, was the key factor leading

to Plaintiff's discharge, testifying specifically as follows:

> . . . I had consulted with Employee Relations.  I had sort of made a decision at this
> point that this was a pattern of missing goals and the decision . . . was made that
> we needed to consider discharge.  So when I look at this email trail, you can
> clearly see [Plaintiff] reached out to [Smedley] the day before the March 6th
> session, because he knew that we were meeting on March 6th, so he made an
> attempt to try to schedule a meeting so that he could tell us in that March 6th
> meeting that he started this task.  It looks like within seven minutes, [Smedley]
> responded back and gave him some direction.  She said her calendar is open,
> schedule a time that's convenient.  That was the end.  [Plaintiff] never followed
> up.  He never scheduled a meeting with her until I then followed up with
> [Smedley] seven days later.  Nothing is done.  . . . At that point I have had enough
> of missed due dates, procrastination, lack of initiative.  The history of
> performance issues has now kind of run its course.  He failed this particular task

---

[10] In response, Plaintiff cites his testimony in support of his position that he followed up with
Smedley by way of the Sametime application to try to set up a time to meet.  Further, Plaintiff
maintains that Klinger never followed up with him to learn that Plaintiff had attempted to set up
a meeting time via Sametime.  (Doc. No. 53 ¶ 60.)

[11] In response, Plaintiff again states that his testimony reflects that he followed up with Smedley
via Sametime, and further, that Klinger never followed up with him to learn that he attempted to
set up a time to talk to Smedley via Sametime.  (Doc. No. 53 ¶ 61.)

> in the CAP.  The decision to discharge has now been made at this point in my
> mind, and that's when I started the process of having a discussion about where to
> go next.

(Doc. No. 37 ¶ 62.)   Accordingly, Klinger decided to recommend discharging Plaintiff, and his

decision was approved by Ash and reviewed by a Senior Analyst from the Employee Relations

Department, and then communicated to Plaintiff on March 13, 2015.  (Id. ¶ 63.)

On April 19, 2018, Plaintiff filed a complaint in this Court, alleging claims of

race/national origin discrimination and retaliation pursuant to Title VII.  (Doc. No. 1.)  Upon the

conclusion of discovery, Defendant filed the instant motion for summary judgment on March 16,

2020 (Doc. No 35), with a Statement of Undisputed Material Facts (Doc. No. 37), appendix

(Doc. No. 38), and a supporting brief (Doc. No. 36).  Because the Court granted the motion of

Plaintiff's attorney to withdraw from representation of Plaintiff on March 19, 2020 (Doc. No.

39), the Court permitted Plaintiff forty-five (45) days to secure new counsel and stayed all

responsive deadlines pertaining to the motion for summary judgment (id.).  Thereafter, after the

expiration of that forty-five (45) day period, on May 5, 2020, the Court issued an Order requiring

Plaintiff to file a status report notifying the Court as to whether he planned to proceed pro se in

this matter or if he required an extension of time to secure new counsel.  (Doc. No. 40.)

On May 14, 2020, Plaintiff filed a motion requesting an extension of time to secure new

counsel (Doc. No. 41), which the Court granted by Order dated May 21, 2020 (Doc. No. 42).  On

July 13, Plaintiff filed a response with the Court indicating difficulty in securing new

representation in light of the COVID-19 pandemic (Doc. No. 43); accordingly, on July 17, 2020,

the Court issued an Order directing Plaintiff to file a status report within ten (10) days notifying

the Court if he planned to proceed pro se in the matter or required an extension of time to secure

new counsel (Doc. No. 44).  Upon receipt of a letter from Plaintiff (Doc. No. 46), and

Defendant's response (Doc. No. 47), the Court issued an Order on August 28, 2020 permitting Plaintiff to proceed pro se in this matter and directing Plaintiff to respond to Defendant's motion for summary judgment by September 18, 2020 (Doc. No. 48).

Thereafter, on September 14, 2020, new counsel filed a notice of appearance on behalf of Plaintiff and a motion for extension of time to respond to Defendant's motion for summary judgment (Doc. Nos. 49, 50).  Ultimately, the Court permitted Plaintiff to file his response to Defendant's motion for summary judgment by October 12, 2020.  (Doc. No. 52.)  On that date Plaintiff filed his Answer to Statement of Material Facts (Doc. No. 53), and a brief in opposition to Defendant's motion (Doc. No. 54).  Defendant filed a brief in reply on October 26, 2020. (Doc. No. 55.)  Accordingly, the motion has been fully briefed and is ripe for disposition.

## II.    LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   See Fed. R. Civ. P. 56(a).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.  See id. at 251-52.  In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion."  See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted.  See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative.  See Anderson, 477 U.S. at 249-50.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  See id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Further, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial.  See Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

III.   **DISCUSSION**

   A.   **Discrimination Claims**

      1.      **Legal Standard Applicable to Discrimination Claims**

Plaintiff asserts claims of race/national origin discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and the Pennsylvania Human

Relations Act, 43 P.S. § 951 et seq. ("PHRA").[12]  The Court's inquiry is governed by the three-part framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) to assess discrimination claims.  See id. at 802-03.  Under that framework, a plaintiff must first establish a prima facie case of discrimination, which includes establishing that (1) the plaintiff is a member of a protected class, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the circumstances raise an inference of unlawful discrimination.  See Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003).  A plaintiff may raise this inference by showing that similarly-situated individuals outside the protected class were treated more favorably than the plaintiff, see Matczak v. Frankford Candy and Chocolate Co., 136 F.3d 933, 939 (3d Cir. 1997), but the test is a flexible one, and different factual circumstances may call for different analyses.  See Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 357 (3d Cir. 1999).

If a plaintiff meets this burden, the defendant must then "articulate some legitimate, nondiscriminatory reason" for the adverse employment action.  See id.  If the defendant articulates a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to show that the defendant's nondiscriminatory reason for the adverse employment action is a pretext for discrimination.  See id.  In proving pretext, "a plaintiff . . . may survive a motion for summary judgment by either (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  See Fuentes v. Perski, 32 F.3d 759, 764 (3d Cir. 1994).

To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual

---

[12]  There is no need to differentiate between Plaintiff's Title VII claim and PHRA claim because the same analysis is applicable to each.  See Weston v. Pennsylvania, 251 F.3d 420, 425 at n.3 (3d Cir. 2001).

dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder <u>could</u> rationally find them "unworthy of credence" and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

<u>Id.</u> at 765 (alteration in original) (citations omitted).

### 2.    Plaintiff's Discrimination Claims

### a.    Arguments of the Parties

In arguing that it is entitled to summary judgment as to Plaintiff's race/national origin discrimination claims, Defendant argues initially that Plaintiff "fails to establish the second and fourth elements of his <u>prima facie</u> claim."  (Doc. No. 36 at 12.)  As to the second element – Plaintiff's qualification for the position from which he was terminated – Defendant argues that Plaintiff fails to meet this element because he "failed to meet the expectations of his new employer Solutions in cross-training on new platforms and completing assigned tasks, including initiating a new project."  (<u>Id.</u> at 12.)  Specifically, Defendant argues that "Plaintiff failed to learn the basics of the Biscom Fax application and then, subsequently, failed to start working on a critical project despite being placed on a CAP."  (<u>Id.</u> at 12-13.)  Accordingly, Defendant argues that Plaintiff "failed to satisfactorily meet the reasonable job expectations of his employer and was not qualified to work as an IT Infrastructure Analyst for Solutions."  (<u>Id.</u> at 13.)

As to the fourth element of a <u>prima facie</u> case, Defendant argues that Plaintiff has adduced no evidence supporting an inference of discrimination.  Defendant acknowledges Plaintiff's argument that Solutions treated non-Ethiopian non-African-American employees more favorably based on a single comparator who received a rating of "3 – met all goals & expectations" on her 2014 performance review, in contrast to Plaintiff, who received a rating of

"2 – needs improvement" on the same review.  (Id. at 13.)  Defendant argues that "Plaintiff and Beahm [the comparator] were in fact held to the same standard.  The difference in their rating stemmed from a difference in their willingness to learn new skills and complete assigned tasks." (Id.)  Defendant argues that Beahm "in addition to her other responsibilities, agreed to learn the 'NICE' application, which facilitated the monitoring of customer-service calls," while Plaintiff, "in contrast . . . refused to learn the 'Biscom Fax' application, which was a similar application dealing with facsimile communications."  (Id. at 13-14.)  Accordingly, Defendant argues that Beahm is not an appropriate comparator to Plaintiff.  (Id. at 14.)

Moreover, Defendant maintains that Plaintiff's attempt to create an inference of discrimination by linking his discharge to his complaint filed with the PHRC in 2007, wherein he alleged that Kellison had engaged in discriminatory conduct toward him, is unavailing.  (Id.) Defendant denies Plaintiff's 2007 allegations, and maintains that "[a]s the years went on, however, Plaintiff clung to his original allegations against Kellison, believing she was reinstating her prior 'harassment' and speculating that she was exerting influence over Klinger."  (Id. at 14-15.)  Defendant asserts that the record contains no evidence of discriminatory animus related to Kellison; moreover, it stresses that "Plaintiff's complaints in regard to Kellison are dated in nature, occurring years prior to Plaintiff's termination by Ash and Klinger," which it argues is a "bridge too far" to support Plaintiff's discrimination claims arising out of his 2015 termination. (Id. at 15.)  Defendant maintains that "the undisputed facts establish a complete lack of evidence to warrant an inference that Klinger or Ash ever considered Plaintiff's race or national origin in any decision related to Plaintiff, or were somehow influenced by Kellison."  (Id. at 16.)

Further, Defendant maintains that, even assuming that Plaintiff could establish a prima facie case of discrimination, it had a legitimate, nondiscriminatory reason for Plaintiff's

discharge, namely that "Plaintiff's unsatisfactory performance in the first instance led to him being placed on a CAP, and it was then his failure to begin working on a significant and time-sensitive project referenced in such CAP that resulted in his discharge."  (Id. at 19.)  Specifically, Defendant asserts that, upon Plaintiff's transition from Highmark to Solutions in 2013, "there was an expectation that all employees would have more than one area of subject-matter expertise," however, Plaintiff "viewed himself as exclusively an expert on the NICE application and resisted taking on any additional responsibilities."  (Id. at 19-20.)  Along those lines, Defendant maintains that, consistent with its new business model, in 2014, "one of Plaintiff's expectations was to learn the basics of the 'Biscom Fax' application," so that Plaintiff "could support a second application in addition to NICE."  (Id. at 20.)  Defendant describes this expectation as essentially requiring Plaintiff "to initially complete two half-hour trainings" in order to enable him to "start completing tickets related to Biscom Fax as they came in to [Defendant]."  (Id.)  At his mid-year review, Plaintiff's manager, Klinger, addressed Plaintiff's lack of progress on this expectation, and adjusted the due date to give Plaintiff additional time to complete it, reiterating to Plaintiff "that he needed to learn Biscom Fax."  (Id. at 21.)  Defendant maintains that Plaintiff was resistant to assuming this new responsibility, and after Plaintiff made no additional progress on this project through the rest of 2014, Klinger and Ash met with Plaintiff to discuss the issue, at which time Plaintiff stated that he did not have enough time for Biscom Fax.  (Id.)  Defendant asserts that Plaintiff also failed to meet his expectations regarding another goal for 2014, which "involved configuring an automation process for the NICE application," and together these failures led to Plaintiff receiving a performance rating of "2 – needs improvement."  (Id.)

Accordingly, Defendant maintains that, as a result of Plaintiff's failure to meet expectations in calendar year 2014, and in coordination with Defendant's Employee Relations Department, Klinger placed Plaintiff on a CAP on February 6, 2015.  (Id. at 22.)  Defendant describes this as a "second chance" for Plaintiff to demonstrate improvement in his work performance, and notes that the expectations contained in the CAP "involved completing the tasks that he failed to complete in 2014."  (Id. at 22.)  Defendant notes that that "one of Plaintiff's more time-sensitive tasks was to work with an operations lead, Amy Smedley ("Smedley"), to coordinate the development of a software pack from the 'Avaya One-X Agent'," and because it "generally took about eight weeks to coordinate such an upgrade, it was important for Plaintiff to expeditiously begin working on it so he could compete it on time."  (Id.)  Because this application was new to Plaintiff, Defendant asserts that the first step for Plaintiff in completing this task "was to schedule a meeting with Smedley so that she could explain the requisite steps."  (Id. at 22-23.)

As described by Defendant, the sequence of events that led to Plaintiff's discharge was as follows.  On March 5, 2015 (the day before Plaintiff was scheduled to meet with Klinger to discuss his CAP progress after thirty days on the CAP), Plaintiff emailed Smedley regarding her availability for a meeting.  (Id. at 23.)  Defendant notes that Smedley replied seven minutes later, telling Plaintiff to schedule a time on her calendar, which was "unilaterally" available to Plaintiff such that he could have "entered the meeting time on her calendar without any approval from Smedley."  (Id.)  Defendant asserts that at Plaintiff's meeting with Klinger the next day, he reported that he had scheduled a meeting with Smedley, and therefore, it appeared to Klinger that Plaintiff was on track as far as completion of this time-sensitive task.  (Id.)  However, Defendant maintains that six days later, on March 12, 2015, Klinger discovered that Plaintiff had not

20

scheduled a meeting with Smedley, and this failure, in light of "the time-sensitive nature of the project, coupled with Plaintiff's dilatory follow up" was "the key event leading to Plaintiff's discharge."  (Id.)  Defendant maintains that the fact that Plaintiff was "already on the CAP" resulted in Klinger's "low tolerance for missing such a key milestone," and therefore, Klinger decided to recommend Plaintiff's discharge, which occurred the next day, March 13, 2015, and was approved by Ash and reviewed by the Employee Relations Department.  (Id. at 24.)

In response to Defendant's arguments, Plaintiff maintains that he has met the second and fourth elements of a prima facie case.  As to the second element, Plaintiff maintains that, at the time of his termination, he was qualified for the position of IT Infrastructure Analyst, as the Job Description published by Defendant in June 2013 for that position lists the only qualification as "High School Diploma or equivalent is required for all levels."  (Doc. No. 54 at 10-11.)  Plaintiff submits that his high school diploma qualifies him for the position from which he was terminated.  (Id.)  Further, Plaintiff maintains that he performed the job satisfactorily in calendar year 2013, as he received a performance rating of "3 – results met all goals and expectations" for his work as an IT Infrastructure Analyst in connection with his February 2014 performance review.  (Id. at 11.)   Accordingly, Plaintiff argues that "[t]here is simply no evidence that [he] was not qualified for the job he held at the time of his termination, and therefore element two" of a prima facie case is met.  (Id.)

In addition, Plaintiff argues that the record supports this Court's conclusion that he has met element four of the prima facie case as well – that "[t]he circumstances of Defendant's termination of Plaintiff give rise to an inference that Plaintiff was discriminated against and terminated because of his race."  (Id. at 12.)  In making this argument, Plaintiff focuses on his 2007 PHRC complaint against Highmark which was resolved via a Settlement Agreement.  He

argues that "following the 2007 settlement, Ms. Kellison continued to act negatively towards Plaintiff and attempt to influence Plaintiff's managers against him."  (Id. at 12-13.)  Plaintiff highlights an October 11, 2012 email that Kellison sent to Plaintiff which he characterizes as a "disparaging email to Plaintiff regarding his work product," and in response to which Plaintiff "filed a complaint to the Human Resources Department on November 26, 2012."  (Id. at 13.) Plaintiff argues that "Ms. Kellison's animus towards [Plaintiff] because of his race and national origin was pervasive throughout the last several years of his tenure with Defendant, and was influential in shaping management's perception of his work."  (Id.)  Further, Plaintiff maintains that he has met the fourth element of a prima facie case because he was replaced by someone outside his protected class.  He maintains that two (2) individuals took over his responsibilities after his termination – David Miller and Tina Beahm – and both are white individuals born in the United States.  (Id.)

In addition, Plaintiff argues that Defendant's nondiscriminatory reason for terminating him is pretextual.  (Id. at 13-14.)  As an initial matter, Plaintiff maintains that the fact that he was placed on a ninety (90) day Corrective Action Plan, instead of a thirty (30) or sixty (60) day Corrective Action Plan is suggestive of pretext.  (Id. at 14.)   More specifically, Plaintiff maintains that the fact that he was less than halfway into the ninety-day corrective action period at the time of his termination on March 13, 2015 indicates that "his alleged performance deficiencies were not the reason for his termination."  (Id.)  Further, Plaintiff notes that the fact that Klinger noted on March 6, 2015 that Plaintiff was "on track with the goal tasks to date" is in direct contrast to Attorney Shuman's March 10, 2015 letter to Plaintiff's counsel stating that Plaintiff was "on the verge of termination" and that Plaintiff "ha[d] not taken any meaningful steps to improve."  (Id. at 15.)  Plaintiff also maintains that the fact that he was awarded a raise

and a bonus on March 3, 2015 is indicative of the pretextual nature of Defendant's March 13, 2015 decision to terminate him for performance deficiencies.  (Id.)

Plaintiff also maintains that, even if the Court determines that he cannot meet the "'but-for' standard of the pretext analysis," his discriminatory termination claim may proceed under a "mixed-motive" theory.  (Id. at 16.)  Plaintiff notes that in a "mixed-motive" case, a plaintiff "need only show that the unlawful motive was a 'substantial motivating factor' in the adverse employment action," which is "less exacting than the causation test in the usual 'pretext' case, where consideration of a protected trait must be shown to be a determinative factor in the adverse action."  (Id. at 16) (quoting Watson v. Se. Pennsylvania Transp. Auth., 207 F.3d 207, 215 (3d Cir. 2000)).  Plaintiff maintains "it is clear that Plaintiff can maintain a claim that his race and national origin were a factor in Defendant's decisions to terminate Plaintiff" sufficient to proceed on a "mixed-motive" theory of discrimination.  (Id. at 16-17.)

### b.   Whether Defendant is Entitled to Summary Judgment on Plaintiff's Discrimination Claims

As an initial matter, the Court need not resolve the parties' dispute regarding whether Plaintiff has adequately demonstrated the second and fourth elements of a prima facie case of discrimination, because even assuming that he has, and upon review of the briefs of the parties and the evidence of record, and construing all facts in the light most favorable to Plaintiff, the non-moving party, the Court concludes that Plaintiff has failed to produce sufficient evidence demonstrating that Defendant's legitimate, nondiscriminatory reason for terminating his employment – namely, Plaintiff's unsatisfactory performance in 2014, which led to his placement on a Corrective Action Plan, and then his failure to begin working on a significant and time-sensitive project referenced in the Corrective Action Plan – was a pretext for discrimination.  As noted above, for Plaintiff's discrimination claim to survive summary

judgment when his former employer articulates a legitimate, nondiscriminatory reason for its action, the burden shifts to Plaintiff to demonstrate pretext by either "(i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." See Fuentes, 32 F.3d at 764. In attempting to meet that burden, Plaintiff points to several pieces of evidence that he maintains are sufficient for a factfinder to reasonably either disbelieve Defendant's articulated reason for termination, or believe that a discriminatory reason was more likely than not a motivating or determinative cause of Defendant's action. The Court addresses each in turn.

First, Plaintiff argues that the fact that he was placed on a ninety (90) day Corrective Action Plan (instead of a thirty (30) or sixty (60) day plan) and terminated less than halfway through the period is suggestive of pretext, indicating that "his alleged performance deficiencies were not the reason for his termination." (Doc. No. 54 at 15.) However, the Court sees nothing in the length of the Corrective Action Plan and the timing of Plaintiff's termination that is necessarily suggestive of pretext where the evidence adduced by Defendant indicates that Plaintiff was terminated upon his manager's realization that Plaintiff had failed to follow-up on a time-sensitive task, contrary to Plaintiff's representation to him several days earlier. Plaintiff has pointed to no evidence of record suggesting that an employee of Defendant cannot be terminated prior to the conclusion of the period of a Corrective Action Plan.

Next, Plaintiff attempts to demonstrate pretext by pointing out that on March 6, 2015, Klinger noted that Plaintiff was "on track with the goal tasks to date," while on March 10, 2015, Attorney Shuman sent a letter to Plaintiff's counsel stating that Plaintiff was "on the verge of termination" and that Plaintiff "ha[d] not taken any meaningful steps to improve." (Id.)

However, the Court is unpersuaded that the juxtaposition of those two statements suffices to support a reasonable factfinder's conclusion that Defendant's stated reason for Plaintiff's termination was pretextual.  As noted by Defendant, Klinger's March 6, 2015 notes were based on his belief that Plaintiff had taken some steps to complete the tasks that were the subject of the Corrective Action Plan, including scheduling a meeting with Smedley regarding the time-sensitive assignment.  (Doc. No. 55 at 3-4.)  As discussed by Defendant, six days after drafting his notes on Plaintiff's progress, Klinger learned from Smedley that Plaintiff had not actually scheduled a meeting with her.  (Id. at 4.)  As far as the Attorney Shuman letter, as Defendant notes, it was sent in response to a letter from Plaintiff's counsel requesting that Plaintiff receive "the promotion in pay and responsibility he deserves" as well as a transfer from Klinger's supervision.  (Id. at 6.)  Defendant notes that in the letter, Attorney Shuman states that Plaintiff "has not taken any steps to warrant a promotion," and points out that, in light of Plaintiff's placement on a Corrective Action Plan due to performance deficiencies in 2014, Plaintiff "is on the verge of termination and has been on precarious footing for a considerable length of time. He was placed on a Corrective Action Plan for well-documented, legitimate and non-discriminatory business reasons and has not taken any meaningful steps to improve."  (Id. at 6-7.)  Viewing the record as a whole, and construing all facts in the light most favorable to Plaintiff, the Court finds no factual basis for Plaintiff's desired inference that Attorney Shuman's response and involvement was an effort to retaliate against and/or discriminate against Plaintiff, and accordingly, that his discharge was not based on legitimate, non-discriminatory business reasons.  The Court's conclusion is buttressed by the record evidence confirming that the

decision to discharge Plaintiff was made by his manager, Klinger, and approved by Ash, and that Attorney Shuman played no part in the decision to discharge Plaintiff.  (Doc. No. 37 ¶ 63.)[13]

In addition, upon consideration of the evidence of record, and construing all facts in the light most favorable to Plaintiff, the Court cannot conclude that Plaintiff's speculation regarding Nancy Kellison provides a basis for a reasonable factfinder to either disbelieve Defendant's contention that Plaintiff was terminated for performance-related reasons or believe that a discriminatory reason was more likely than not a motivating or determinative cause of Defendant's decision to terminate Plaintiff's employment.  This is so for two primary reasons.  First, Plaintiff's allegations regarding Kellison are many years removed from Defendant's decision to discharge Plaintiff, originating in 2005 and culminating in a Settlement Agreement entered into in 2007.  Plaintiff's most recent allegations regarding Kellison involve a 2012 email drafted by Kellison that was the subject of a complaint Plaintiff filed with Defendant's Human Resources Department.  Again, the time span between this email and Plaintiff's termination – more than two years – fails to support an inference that there was any causal connection between Kellison's email and Plaintiff's termination.[14]  Second, Plaintiff has pointed to no record

---

[13] Plaintiff's effort to demonstrate pretext by arguing that, at the time of his termination, he "had just been awarded a raise and a bonus" is similarly unavailing.  (Doc. No. 54 at 15.)  The Court notes initially that this contention is based on facts offered by way of the Statement of Additional Facts filed by Plaintiff in an effort to oppose Defendant's motion in violation of Local Rule 56.1.  (Doc. No. 53 ¶¶ 64-85.)  As discussed supra in note 1, this Statement of Additional Facts is properly disregarded by the Court in connection with its consideration of Defendant's motion.  However, even if the Court were to consider Plaintiff's statement regarding his receipt of a raise and a bonus, upon consideration of the record as a whole, the Court cannot conclude that this fact provides a basis for a reasonable factfinder to disbelieve Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff.  Rather, the Compensation Statement referenced by Plaintiff in connection with this argument confirms that, as a result of Plaintiff's 2014 performance rating, he lost $1,859.74 in bonus payments.  (Doc. No. 53-7.)

[14] Regardless of Plaintiff's apparent belief that the Kellison email was harassing and derogatory, upon review of the record and the context of the communication, the Court is persuaded that

evidence from which a reasonable factfinder could conclude that Klinger or Ash (the two individuals responsible for the decision to terminate Plaintiff's employment) were in any way influenced by Kellison in connection with the decision to terminate Plaintiff's employment.  For these reasons, Plaintiff's speculation regarding Kellison and her efforts to undermine his employment with Defendant is insufficient to create a genuine issue of fact as to pretext.  See Kier v. F. Lackland & Sons, LLC, 72 F. Supp.3d 597, 609 (E.D. Pa. 2014) (stating that "[a]n inference of race-based discrimination cannot arise simply from an employee's subjective belief that his or her race somehow influenced the challenged employment action") (quotation omitted); McKnight v. Sch. Dist. Of Phila., 171 F. Supp. 2d 446, 448 (E.D. Pa. 2001) (noting that "[u]nsubstantiated and subjective beliefs and opinions are not competent summary judgment evidence") (quotation omitted).

The Court also finds Plaintiff's contention that he was replaced by someone outside his protected class insufficient as a basis for a reasonable factfinder to disbelieve Defendant's performance-based reason for discharging him.  The Court is persuaded by Defendant's position that the individual who assumed Plaintiff's responsibilities upon his termination was evaluated under the same standard as Plaintiff, but had received a "3" performance rating for 2014 in part because of her willingness to learn new skills, which was a demonstrated area of weakness for Plaintiff and one which led to his placement on a Corrective Action Plan and ultimate termination.

Accordingly, upon review of the evidence of record, and construing all facts in the light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to point to objective

there was nothing objectively harassing or inappropriate in the Kellison email challenged by Plaintiff.

27

evidence in the record from which a factfinder could reasonably either disbelieve Defendant's

articulated reason for terminating Plaintiff's employment or believe that some invidious

discriminatory reason was more likely than not a motivating or determinative cause of

Defendant's action, instead engaging in speculation to support his argument that Defendant's

stated performance-based reason for terminating him was a pretext for race/national origin

discrimination.[15]  Therefore, the Court will grant Defendant's motion for summary judgment on

those claims.  The Court turns to Plaintiff's retaliation claim.

### B.      Plaintiff's Retaliation Claim

#### 1.      Legal Standard Applicable to Retaliation Claim

The McDonnell Douglas burden-shifting framework also applies to retaliation claims

under Title VII.  See Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015).  As stated

by the United States Court of Appeals for the Third Circuit in Daniels:

> Under the McDonnell Douglas framework, a plaintiff asserting a retaliation claim
> first must establish a prima facie case by showing '(1) [that the plaintiff engaged
> in] protected activity; (2) adverse action by the employer either after or
> contemporaneous with the employee's protected activity; and (3) a causal
> connection between the employee's protected activity and the employer's adverse
> action.' Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007) (quoting
> Fogelman v. Mercy Hosp. Inc., 283 F.3d 561, 567-68 (3d Cir. 2002)).  If the
> plaintiff makes these showings, the burden of production of evidence shifts to the
> employer to present a legitimate, non-retaliatory reason for having taken the
> adverse action. Id. If the employer advances such a reason, the burden shifts back
> to the plaintiff to demonstrate that 'the employer's proffered explanation was

---

[15] With regard to Plaintiff's request (made in his opposition brief) that the Court consider his
discrimination claims under a "mixed motive" theory, the Court finds that request unavailing,
because for a mixed motive theory to apply to a plaintiff's discrimination claims, the plaintiff
must "present sufficient evidence for a reasonable jury to conclude . . . that race . . . or national
origin was a motivating factor for any employment practice."  See Desert Palace v. Costa, 539
U.S. 90, 102 (2003).  Accordingly, even under this theory of discrimination, "a plaintiff must
produce some evidence of discrimination."  See Cange v. Phila. Parking Auth., 451 F. App'x
210, 213 (3d Cir. 2011) (citation omitted).  As discussed more fully above, Plaintiff has failed to
produce sufficient evidence from which a reasonable jury could conclude that his race or national
origin was a motivating factor for his termination.

false, and that retaliation was the real reason for the adverse employment action.'
Id. (quoting Moore [v. City of Philadelphia], 461 F.3d [331,] 342 (3d Cir. 2006)).

Daniels, 776 F.3d at 193.

"To engage in 'protected activity' a plaintiff cannot complain about merely unfair treatment, rather they must complain about discrimination based on membership in a protected class." McClain v. Avis Rent A Car Sys., Inc., 648 F. App'x 218, 224 (3d Cir. 2016). Complaints may be in the form of formal disciplinary charges or grievances against an employer, and may also include "informal protests of discriminatory employment practices, including making complaints to management." See Daniels, 776 F.3d at 193 (internal quotation marks omitted); Merke v. Lockheed Martin, 645 F. App'x 120, 124 (3d Cir. 2016). As to what constitutes protected activity, the standard "requires an 'objectively reasonable belief' that the activity the plaintiff opposed constituted unlawful discrimination under the relevant statute." See Daniels, 776 F.3d at 193-94 (citation omitted). With regard to the third element of a prima facie case, "[t]o demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if 'unusually suggestive.'" See id. at 196 (citations omitted). However, in the absence of temporal proximity,

we consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action.

See id.

With regard to retaliation claims, the burden a plaintiff faces to establish a prima facie case of discrimination is different from that plaintiff's burden of demonstrating causation at the pretext stage of the McDonnell Douglas analysis, as explained by the United States Court of

Appeal for the Third Circuit in <u>Young v. City of Philadelphia Police Department</u>, 651 F. App'x

90 (3d Cir. 2016).  The Third Circuit stated as follows:

> [T]o prove causation at the pretext stage, the plaintiff must show that she would
> not have suffered an adverse employment action 'but for' her protected activity.
> <u>See</u> <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517, 2533 (2013).  In
> <u>Nassar</u>, the Supreme Court analyzed Congress's use of the term 'because' in Title
> VII's retaliation provision, 42 U.S.C. § 2000e-3(a), and compared it with the
> 'motivating factor' language in the status-based discrimination provision.  <u>See</u> <u>id.</u>
> at 2527-28.  While decided in the context of a review of rulings on post-trial
> motions and not in the context of the <u>McDonnell Douglas</u> burden-shifting
> framework, the <u>Nassar</u> Court held that a retaliation plaintiff must prove traditional
> 'but-for' causation to prevail on the claim, and that the 'mixed-motive' standard is
> appropriate only in status-based discrimination cases, where Congress used the
> term 'motivating factor.'  <u>Id.</u> at 2532-34.

<u>See</u> <u>Young</u>, 651 F. App'x at 96.  Accordingly, "to survive summary judgment, [a plaintiff] must

show proof that, in the absence of his prior protected activity, [the defendant] would not have

taken any of the actions it did."  <u>See</u> <u>Sawl v. Shulkin</u>, No. 16-1440, 2018 WL 4501061, at *9

(W.D. Pa. Aug. 27, 2018), <u>report and recommendation adopted</u>, 2018 WL 4491182 (W.D. Pa.

Sept. 19, 2019).  In other words, a plaintiff must provide some evidence that "the unlawful

retaliation would not have occurred in the absence of the alleged wrongful action or actions of

the employer."  <u>See</u> <u>Nassar</u>, 570 U.S. at 360.

### 2.   Plaintiff's Retaliation Claim

#### a.   Arguments of the Parties

In arguing that it is entitled to summary judgment on Plaintiff's retaliation claim,

Defendant argues that the Plaintiff's theory of retaliation for engaging in "protected activities"

on two separate occasions "ignores . . . both the context of his interactions with Solutions'

Employee Relations Department as well as the timing of such encounters."  (Doc. No. 36 at 16.)

Defendant maintains that neither instance of "protected activity" referenced by Plaintiff supports

a <u>prima facie</u> claim of retaliation.  As to the first instance of protected activity alleged by

Plaintiff – his report of "racial harassment" by Kellison in 2005, which ultimately resulted in the filing of a PHRC complaint against Defendant in 2007, Defendant argues that this protected activity "lacks the temporal proximity necessary to establish a causal connection between the activity and the discharge," maintaining that "[t]here is simply no reason for a complaint against a former employer to have any weight or bearing on a discharge occurring eight years later." (Id. at 17.) Moreover, Defendant argues that "the decisionmakers regarding Plaintiff's discharge were wholly uninvolved in Plaintiff's original 2007 allegations against Highmark." (Id.)

As to the second alleged instance of protected activity – the letter Plaintiff's attorney sent to Defendant in February 2015 indicating that Plaintiff was considering filing a discrimination charge – Defendant first argues that the letter consisted of "Plaintiff's perceived workplace slights" which it maintains is insufficient to establish protected activity. (Id. at 18.) Defendant also argues that, even assuming that the letter constituted protected activity, "there was nothing 'unusually suggestive' in the timing of the letter and Plaintiff's discharge to warrant an inference of causation." (Id.) In fact, Defendant argues that the timing of the letter – sent February 23, 2015, a few weeks after Plaintiff's placement on a Corrective Action Plan – "warrants the opposite inference – i.e., not that Solutions disciplined Plaintiff for sending the letter, but rather that Plaintiff sent the letter because he was subject to discipline and anticipated being fired." (Id.) Further, Defendant maintains that "Plaintiff's failure to start working on the software upgrade despite already being on a CAP . . . severs completely any potential causation." (Id.) In addition, Defendant maintains that, even assuming that Plaintiff could demonstrate a prima facie case of retaliation, Defendant has articulated a legitimate, nondiscriminatory reason for Plaintiff's termination (i.e., Plaintiff's performance failures, described more fully above), and

that Plaintiff cannot demonstrate that Defendant's reason was a pretext for discrimination.  (Id. at 19-24.)

In response, Plaintiff maintains that he has clearly demonstrated two instances of protected activity – the first, his 2007 complaint with the PHRC against Highmark alleging national origin discrimination.  (Doc. No. 54 at 18.)  Second, he maintains that his attorney's February 23, 2015 letter to Defendant was not "[a] general complaint of unfair treatment," but rather, the letter indicated that Plaintiff "was contemplating filing another charge based on retaliation, age and race discrimination," which he maintains constitutes "protected activity" within the meaning of Title VII.  (Id.)

With regard to the third element of a prima facie retaliation case – causation – Plaintiff argues that he "must only establish that the circumstances of his termination give rise to an inference of retaliation arising from his prior protected activity to meet his prima facie case," and that "[t]he uncontested facts easily support this inference."  (Id. at 18-19.)  Plaintiff maintains that "[t]he causal connection between [his] protected activity and his termination is demonstrated by the facts leading up to his termination."  (Id. at 19.)  In his recitation of the sequence of events leading up to his termination, Plaintiff relies on facts presented by way of his Statement of Additional Facts, contained in paragraphs 64-85 of his ASMF.  As the Court discussed supra at note 1, the Local Rules of this Court do not permit a party opposing a summary judgment motion to do so by way of the presentation of his or her own statement of facts, and that Statement of Additional Facts is properly disregarded by the Court in connection with its consideration of Defendant's motion.  However, the Court considers all evidence of record, viewed in the light most favorable to the Plaintiff, in addressing Defendant's motion.  Accordingly, the Court has

taken note of the record evidence referenced by Plaintiff by way of his Statement of Additional Facts.

With regard to any effort to demonstrate that Defendant's legitimate, nondiscriminatory reason for Plaintiff's termination was pretextual, Plaintiff simply reiterates that the evidence he offers in an effort to demonstrate pretext in connection with his discrimination claim is sufficient for a reasonable factfinder to conclude that Defendant's stated reason for Plaintiff's termination is pretextual in the context of his retaliation claim.  However, Plaintiff fails to even note, much less discuss, the differing legal burden applicable to the two claims, and the necessity of demonstrating "but for" causation in order to establish pretext in connection with his retaliation claim.  See Young, 651 F. App'x at 96 (holding that "to prove causation at the pretext stage, the plaintiff must show that she would not have suffered an adverse employment action 'but for' her protected activity").

**b.      Whether Defendant is Entitled to Summary Judgment on Plaintiff's Retaliation Claim**

In considering Plaintiff's retaliation claim, the Court assumes that the two instances of protected activity alleged by Plaintiff – the filing of a PHRC complaint against Defendant's predecessor in 2007 and the February 23, 2015 letter submitted by Plaintiff's counsel to Defendant – constitute "protected activity" within the meaning of Title VII for purposes of establishing a prima facie claim of retaliation.  The Court need not resolve the parties' dispute regarding whether Plaintiff has established the causation element of a prima facie retaliation claim, because it finds that, even assuming that Plaintiff has established a prima facie case of retaliation, Plaintiff's claim fails because, as noted above, proof of causation at the pretext stage of a retaliation claim requires a showing that Plaintiff "would not have suffered an adverse employment action 'but for' [his] protected activity."  See Nasser, 133 S. Ct. at 2533.  Pursuant

to this standard, in order "to survive summary judgment, [a plaintiff] must show proof that, in the absence of his prior protected activity, [the defendant] would not have taken any of the actions it did." See Sawl, 2018 WL 4501061, at *9.  The record here is devoid of proof that Defendant would not have terminated Plaintiff's employment in the absence of his 2007 PHRC complaint or his attorney's February 23, 2015 letter to Defendant.  Rather, the evidence of record supports Defendant's position that Plaintiff's longstanding and well-documented failures to meet performance expectations, which resulted in his placement on a Corrective Action Plan on February 6, 2015, along with his dilatory follow-up on a time-sensitive project, were the motivating factors for Plaintiff's termination.

Accordingly, as Plaintiff has failed to point to evidence in the record from which a factfinder could reasonably conclude that his termination would not have occurred "but for" his protected activity, Plaintiff has failed to create a genuine issue of material fact with respect to his retaliation claim.  The Court will grant Defendant's motion for summary judgment on Plaintiff's retaliation claim.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court will grant Defendant's motion in its entirety. An appropriate Order follows.